Good morning. I'm Michael Abzug. I've been appointed by the court to represent the petitioner appellant. Since the provisions of the Anti-Terrorism and Enforcement Definitely Act apply to this case, there are really two questions that have to be examined. The first, of course, is whether the decision was contrary to or involved in unreasonable application of clearly established federal laws determined by the U.S. Supreme Court. As to that issue, I'm satisfied to rest on the points that I made in my opening reply brief, subject naturally to any questions by the court, which I'll be happy to address as best I can. I would like to focus some additional comments on the second prong of the test, which is if error occurred, whether it had a substantial or injurious effect on the verdict. And I'd like to briefly raise three points that weren't addressed in my briefs. The first is that as to this issue, we basically face a blank slate. That is, unlike the first issue, neither the California courts nor the district court below performed any analysis of whether the error, if it occurred, had an injurious impact on the verdict. I'm making that statement not in any critical way. It's just an observation of fact. The reason that the California courts didn't reach the issue, of course, is because they found that no error occurred in the first place, but nonetheless there were no findings of fact on the issue. The second point that I wanted to make or emphasize, and this was addressed somewhat in my pleadings, is that the admission of the preliminary hearing testimony of Doris Brown, which was the witness who didn't appear, had, at least in my view, a devastating impact on the defense. Basically what her testimony added was an identification of the defendant at the scene of the robbery. According to her preliminary hearing testimony, when confronted with the defendant at the scene, she said, that's the man, and she said she was certain in her identification. Without that testimony, the record is far less probative as far as her identification is concerned. What about the 911 call? Well, in the 911 call, she simply stated that a, quote, short black guy had fled and then described the clothing that she saw, tan pants, a baseball cap, and a black sweatshirt. That description, I would argue, was not very probative without her preliminary hearing testimony because the description of the defendant when he was arrested was wearing different clothes. He wasn't wearing a baseball cap. The upper apparel that was described was not a black sweatshirt, but it was a green and black shirt, and the pants were brown and tan. So I would say that there was some similarity in the description of the clothing, but it didn't match compared to an on-the-scene identification of the defendant by Ms. Brown, which I think is very powerful. That was a very pale substitute. At the preliminary hearing, the officer, excuse me, at the trial, the officer only testified that she told him that the pants matched. There was no evidence that came in outside the preliminary hearing testimony that she had made a positive ID of the defendant at the scene. So that's one point I wanted to make. The third point that I wanted to make is that. Would the cross-examination at the preliminary hearing lend itself to reliability? I would say no, and I have to say no for two reasons. First of all, I would have to concede that the cross-examination, I've seen worse. It wasn't negligible. But the reason I don't think it's a satisfactory substitute is for two reasons. First of all, generally, and this point was made in Barber v. Page, cross-examination at a preliminary hearing is no substitute for cross-examination at trial, which Barber v. Page identified as a trial right. And that's for two reasons. First of all, because the inquiry at trial, as the Supreme Court said, is more searching. At a preliminary hearing, the standard is different, and the cross-examination tends to be generally less exhaustive than that at trial. And then secondly, as the Supreme Court said, and it's a very brief quote, and I'll read it to you if you want me to do it. It says the right of confrontation, this is for Barber v. Page at page 725, the right of confrontation is basically a trial right. It includes both the opportunity to examine and the occasion for the jury to weigh the demeanor of the witness. So the first response that I would make is that even if the cross-examination was superlative, which, as I'll get to in a moment, I don't think it wasn't, the defendant was deprived of the opportunity to have the jury assess the demeanor of Doris Brown by the fact that she wasn't present at trial. And the importance of a jury assessing a demeanor at trial is emphasized by the Ninth Circuit model instructions themselves, which set forth seven factors to assess the credibility of a witness, one of which is to assess the demeanor of the witness. So the first response that I'd make is that the defendant was, the petitioner was deprived of the opportunity to have the jury assess the credibility of Doris Brown. Secondly, in direct response to your question, Your Honor, it's worth noting that the defendant represented himself at the preliminary hearing. He was cross-examining in pro per. He wasn't represented at trial. Ohio v. Roberts kind of discusses this issue and declines to hold that the difference in lawyers between a preliminary hearing and a trial lawyer is dispositive, but nevertheless, I think it's worth noting. The other thing that the defendant failed to do, which I think a trial lawyer would have done at trial, is that Doris Brown, when she was shown the photo spread, not only failed to identify the defendant, but actually picked out another person other than the defendant in the photo spread. And the petitioner's cross-examination, in my view, if the court will review the record, as I know you will, didn't bring that feeling out at all. And I think that's a serious impeachment of Ms. Brown's credibility. And just through inartfulness of cross-examination, if you read the preliminary hearing transcript, you won't get that at all, and I'm sure the jury didn't get it at all when it was read to them at trial. So for that reason, for those reasons, the cross-examination of Ms. Brown that was done at the preliminary hearing was not an adequate substitute. So those things. You covered your three points, and you have about a minute 45, so why don't you say a few words. Good morning. Excuse me. Deputy Attorney General J. Mark Lehman on behalf of Respondent Warden Larry Small. I agree with the petitioner that there are two basic issues, the due diligence under ADEPA and a harmless error issue under BRACT. For the sake of continuity with my brother counsel's argument, I'll go ahead and skip to the harmless error issue. Well, let's, before we do that, I know Mr. Abzug skipped over the error issue, but there was a, the DA served a subpoena early on on two, actually. Well, the first one, though, and the hearing was continued. The first subpoena required her to be in court on a certain date, and the witness coordinator called and said, or when the subpoena was delivered, told her to call in and said, you check because you might be on call, it might not go that day. Correct. Now, it was usually, you know, my experience when I was a state court judge that usually the witnesses would appear in court, and we would order them to appear at another time. So there was a court order. Right. Right. Let me hit a few. And that was a very prudent, you know, that was kind of customary what happened. Maybe things have changed. I don't know. A couple things on that issue. First of all, there were two subpoenas served. Well, the second subpoena was served just four days before. Was that the third subpoena? The third. And my apologies. We really weren't very clear on this in the briefs. And this is, I won't give you the pinpoints unless you like them, but the 402, the due diligence hearings at 145 and 75B-RT. Ms. Ford testifies that sometime in January, Ms. Brown was served with a subpoena to appear on February 7th, that being the first of the continued trial dates. Was that the trial date or a preliminary hearing date? No, that was the trial date. The preliminary hearing was September 18th. Ms. Brown did testify. That, by the way, is at CT 55 to 75. At that point, Ms. Brown did call Ms. Ford, as the directions on the subpoena indicated, and she indicated that the trial had been continued. Again, that was a defense motion for continuance and that she could put on call for 10 days. The second subpoena was the one we're referring to as the first. That's the February 24th serving for February 26th. I gather she didn't appear in court on the first one. Correct. Correct. If I could put some context. So then they had to serve her again. Right. Right. What we had here was a trial that was set five times within four months. We had a series of continuances, again, a defendant's motion, generally simply for further preparation. Those motions to continue trial in the minute orders granting them can be found at CT 303 to 317. We begin at January 9th. We go all the way to April 25th until both parties announce ready for trial. So to hit your earlier concern as to what a state court judge would do, in my experience what will happen is unless you've got a continuance, that will be the procedure. However, if the court is going to grant a defendant's continuance, there's really nothing to have the witness show up to, and it's simply a matter of coordinating with the witness coordinator as to when he or she will be needed for trial. And that's what happened here. And we didn't actually have any indication that Ms. Brown was – well, we had no indication that she was intending to go out of town. First indication that she was out of town was, I believe, the March 18th call. This is after two subpoenas have been served. March 18th call from her daughter, Ms. Buckner, to Nettie Ford. That can be found at RT 161 to 162 and then 167 to 168. At that point, it's a matter of continuing contact in the house, speaking alternatively to Ms. Brown's daughter and then grandson in an attempt to locate her, find out where she is. Repeated attempts to get a phone number. Mr. Robinson indicated that she could call Collette from Atlanta. So, again, when you put it into context, if you have continual defense motions which are granted for continuance, we don't know when we're going to go to trial. In fact, even at the end of the due diligence hearing, we have the prosecution repeating his offer for a plea agreement until testimony begins, and that's to be found at RT 188. So my point here is it's hard, as I stand here right now, to think of what the prosecution could also more have done to secure Ms. Brown's attendance. By the time we found out that she had any intent or the prosecution found out she had any intent to leave the state or even leave town, she had already done so. Once she was out of town, that was basically it, unless she voluntarily agreed to return. You couldn't sort of leave the cell. Yeah, I don't know how else we could have located her. After all, she was a visitor. It's not as if she moved and there was some sort of tracking records. And I will say also, as far as due diligence, Ms. Brown's California driver's license number and date of birth were obtained in the first call. That was back in January 21st. Ms. Ford also was able to obtain her, Ms. Buckner, the witness's daughter's birth date and California driver's license that go into the idea of due diligence. Well, the DA certainly knew, the witness coordinator certainly knew the importance of serving a subpoena, but practice as a trial court judge, though, is when you have the witnesses, when trials are continued repeatedly, at some point along the way, it's important to have the witness in court to let them know that they need to keep in touch, they need to, certain things they need to do. If they're going to leave the state, they need to advise the DA, they need to, you know, and if there was any hesitation on their part, they complained about having to be a witness or reluctant about the proceedings, and we would just order them in. You're ordered to be back here. And if you're not here, you're in contempt and blah, blah, blah. Sure, sure. A couple things. One, we didn't have any indication that we had a reluctant witness. I believe we have a sole statement from Mr. Robinson on the second service of subpoena that she was not real happy to receive the subpoena. He also said, I believe, the statement right before that, and that can be found at page 146 of the RT, she was pretty cooperative. In fact, we also have, just so we're clear, we have a district court finding in this case that the witness was cooperative, and if I can quote from 249 of the experts of record, this is at the R&R, and this is the quote, Brown had been cooperative in appearing and testifying at the preliminary hearing, previously accepted to service to appear at an earlier date, and remaining in contact via her daughter with the witness coordinator. Given that kind of factual finding of cooperation, and the continual continuances from the defendant, and the fact that it was not clear we were going to have a trial at all, I understand your point about at some point getting a witness in there to realize that it is practice. Or going to the judge. Going to the court and saying we need an order to compel attendance, at least that you have a little more leverage with that, even though you haven't served the subpoena. But you could, you know, when somebody serves a court order, sometimes it has a little more of a psychological effect than getting a subpoena, especially when we have multiple continuances. Sure, sure. This is a pretty critical witness. I don't think it is at all. And I guess that's as good of a segue as any into the rect issue. Thomas, I'd like to hit on the 911 tape you were talking about. It did come in at trial. Well, I don't think everybody understands it came in at trial. I think the argument was it had a slightly different description, and therefore it was without the preliminary examination testimony, it was less than useful in terms of making a positive identification. I think that's the argument. Well, as far as positive identification, it was very useful. In that Officer Tim Harris testified that he came in, viewed the home, saw the broken screen and the cut wires, which is what's on the 911 tape. But let's go ahead and get straight to the Brown testimony. And, again, everything I'm going to be pointing to came in at trial. I'm not going to give the pinpoints unless the court wants them. She testified, Ms. Brown, she only saw the back of the person's head. She also testified that the field ID that the petitioner was talking about was based on the police turning him around and him recognizing his clothes and his build, and that's it. It also came in at trial that Ms. Brown was unable to pick out anyone in a June 30th lineup. And, again, she said, well, everyone has the same clothes, and I only saw the back of him, so how can you expect me to pick him out? On August 2nd, there was a photo lineup. She was unable to pick anyone out at that. And then just, she testified mistakenly again at the preliminary hearing, which also came in at trial that it was her daughter that made the 911 call, not her. And, finally, on Ms. Brown and her testimony coming in, she specifically was unable to identify Mr. Petitioner at the preliminary hearing. That's hardly a devastating witness for Petitioner. And then to briefly follow up, we also had testimony from an officer, Malecki, I think it was. The petitioner was apprehended just two blocks from Ms. Brown's house. And the second burglary also followed a fairly similar modus operandi in the sense that it was an open window, cut a screen, went in, apparently trying to get a stereo. And then, unless the Court has any other questions, just lastly, I'd like to bring up, I think, assuming we have both a due diligence problem under AEDPA and a substantial injurious effect, I think there's a real Teague problem here as far as announcing a new rule of law. What's the Teague problem? Well, what would be the rule of law? Reasonableness, I'm having a hard time seeing. I don't have your briefs in front of me. Did you raise Teague in your briefs? We did. We did. So what rule of law are you arguing is the new rule? I'm sorry? What rule of law are you arguing is the new rule? Well, I would approach it the opposite. I'm not sure what rule of law would be applying here other than to generalize reasonableness, which I don't think it gets us through AEDPA. In other words? Well, the rule we're applying is the confrontation clause. That's the rule we're talking about. Well, okay. If the rule of law is in the confrontation clause, I should say you're not going to buy my Teague argument. Well, are you trying to make a Teague argument on an interpretation of the Anti-Terrorism Act? Is that? Well, yes. But the rule of law is the application of the substantive rule of criminal procedure rather than the Anti-Terrorism Act. I'm sorry, the rule of criminal procedure. Fair enough. I see that one's not going anywhere. That's all right. You know, creative arguments are good. I'll reread it with great care. Thank you for your argument. Any further questions from the panel? You have a couple of minutes for rebuttals. Yes. Without beating a dead horse to jelly, there is no Teague problem here. I mean, in Packer v. Hill, which is a recent Ninth Circuit case cited in my brief, they indicated that the fact that the rule of law was fact-intensive, which is what it is here, that is whether good faith efforts were used to secure a witness's ---- What about the aspect of AEDPA, the tests that we apply? I'm not sure I understand your question. Well, we're not looking at this as a Federal case. This is a State case coming to us. So as a court of appeals, we look to see whether the decision was an unreasonable application of fairly established Federal law. I'm sure you're familiar with that, sir. Yes. Well, what about that? Does that change our perspective a little bit? Well, I don't know. I'm not trying to be obtuse. I don't know what you mean. It is the perspective that you look at it as to whether there was an unreasonable application of the clearly announced ruling in Barber v. Page. But the ---- I want to just, if I may, just use the very short time I have left to respond to the point that Judge Pius raised. The fact ---- again, the fact that I didn't address the first prong in my opening remarks in no way was ---- I didn't take it that long. Let me cut to the chase. Let me summarize in the 30 seconds I have what the problem was, what the unreasonable actions by the State were. And I think Judge Pius really got to the heart of the matter. The relevant facts are these, and I can summarize in 15 seconds. On February 24th, Ms. Brown was served with a subpoena calling for her appearance on February 26th. Later that day, the witness coordinator gets a call from a person that identifies herself as Ms. Brown's daughter, Nettie Buckner, and a conversation ensues in which the witness coordinator, Thelma Ford, says to the person identifying themselves as the witness's granddaughter that she is released from the subpoena on condition, and this is very clear on the record, on condition that Doris Brown call to confirm a receipt of the subpoena. Doris Brown never calls. And the unreasonable actions of the State are that Doris Brown, who was under the subpoena power of the court, was released without qualification two days before the trial date was set, which was February 26th, and the State lost all ability to recall her. This is not a situation where ---- Well, they just had to serve her with another subpoena. I beg your pardon? They had to serve her with another subpoena. Well, that's right. If the trial didn't go forward. That's right. That's my point. But they didn't. They didn't serve her with another subpoena, and they didn't ---- Well, now I'm confused. I thought they served her again with another subpoena. No, no, no. They tried to. They tried to. They tried to on ---- They tried to serve her on April 24th, but by that time, you know, nobody knew where she was. Right. She was in Atlanta. The trial was only four days away. So the unreasonable action was that they released her two months before without having ---- without asking her to come to court. Right. Usually that's the practice. That is the practice. I shouldn't say that because, you know, it's been a long time since I've been there. Well, I mean, in civilian witnesses especially, we're not talking about a professional witness here. Right. I mean, the fact that she expressed unhappiness or not with being served by a subpoena is kind of a red herring. I mean, even if the person wasn't unhappy and was delighted ---- I'd be unhappy. ---- happy as a clam, the ---- I think prudence, prudence would dictate, reasonable prudence would dictate that either they be brought into court and be brought under the subpoena power of the court and ordered back on a date certain. And this trial wasn't ---- they may not have known 100% of the case was going to go to trial, but they certainly knew on February 26th when she was still under subpoena power of the court that the trial had been continued to a date certain. I mean, the trial wasn't just ---- the trial just didn't evaporate in the air. So she could have been brought into court and should have been brought to court on the 26th or, at a bare minimum, there should have been some personal contact with the witness to have her state or have her represent that she was going to cooperate and appear. And they did neither. Even when the ---- even when this court demanded through the granddaughter that called on the 24th call to affirmatively represent that she had received the subpoena, she never called back. She didn't speak to her on the 24th, the 25th, the 26th. Now the subpoena power is gone, and she's totally in the wind. She evaporates. So it's the fact that they couldn't bring her in to serve the subpoena two months later is a self-fulfilling prophecy. Of course they couldn't. All right. That summarizes the argument. Thank you. Thank you very much for your arguments. The case, as heard, will be submitted.
judges: Thomas, Paez, Reed